1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**JABURG & WILK, P.C.**
Maria Crimi Speth, ABN 012574
        E-mail: mcs@jaburgwilk.com
Aaron K. Haar, ABN 030814
        E-mail: akh@jaburgwilk.com
3200 N. Central Ave., Suite 2000
Phoenix, Arizona 85012
Telephone: (602) 248-1000
Facsimile: (602) 248-0522

**ALLEN DYER DOPPELT + GILCHRIST PA**
Robert H. Thornburg *(pro hac vice forthcoming)*
        E-mail: RThornburg@AllenDyer.com
1221 Brickell Ave., Suite 2400
Miami, Florida 33131
Telephone:   (305) 374-8303
Facsimile:   (305) 374-8306

*Attorneys for Plaintiff Modulus Global Inc.*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Modulus Global, Inc., a Delaware Corporation,<br><br>                 Plaintiff,<br><br>        v.<br><br>Quintzy FZE LLC, a Foreign Limited Liability Company, BloxeoTechnology Inc., a Foreign Corporation, Bitsmo Group LLC, a California Limited Liability Company, Techroo, Inc. d/b/a TRADIFY, a California Corporation, Efficacious Solutions PVT. LTD., a Foreign Private Limited Company, Ankit Singhal, an Individual, Rajeev Sharma, an Individual, Ethan Kang, an Individual, Chan Yang Choi, an Individual, and Does 1-10, Inclusive,<br><br>                 Defendants. | Case No.: _____<br><br>**COMPLAINT FOR DAMAGES:**<br><br>**MISAPPROPRIATION OF TRADE SECRETS UNDER BOTH 18 U.S.C. § 1836(b)** *et al* **AND A.R.S. §§44-401 to 44-407; CONSPIRACY; BREACH OF EMPLOYMENT AGREEMENT; BREACHES OF FIDUCIARY DUTY AND DUTY OF LOYALTY; TRESPASS TO CHATTEL; UNFAIR COMPETITION; AND TORTIOUS INTERFERENCE**<br><br><u>**JURY TRIAL REQUESTED**</u> |

Plaintiff MODULUS GLOBAL INC. ("Modulus" or "Plaintiff") for its Complaint against Defendants QUINTZY FZE LLC ("Quintzy"), BLOXEO TECHNOLOGY INC. ("Bloxeo"), BITSMO GROUP LLC ("Bitsmo"), TECHROO, INC. d/b/a TRADIFY ("Techroo"), EFFICACIOUS SOLUTIONS PVT. LTD. ("Efficacious"), ANKIT SINGHAL ("Singhal"), RAJEEV SHARMA ("Sharma"), ETHAN KANG ("Kang"), CHAN YANG CHOI ("Choi"), and DOES 1-10 ("Does") (Quintzy, Bloxeo, Bitsmo, Techroo, Efficacious, Singhal, Sharma, Kang, Choi and Does collectively "Defendants"), by and through its undersigned counsel, hereby alleges and states as follows:

## THE PARTIES

1.      Modulus is a corporation formed and organized under the laws of the State of Delaware.  Since February 2015, Modulus has been authorized to transact business through the Arizona Corporation Commission and maintains its offices at 9375 E. Shea Blvd, Suite 100, Scottsdale, Arizona 85260.  Modulus provides advanced financial technology products and services to professional traders, brokerages, trading firms, trading exchanges, and related institutions.

2.      Singhal is an individual working at Shop No-202&203, Balaji Plaza LSC-3, Sector-8, Rohini, Delhi 110085 India.  Singhal also maintains addresses at (a) 14850 N. Scottsdale Road, Scottsdale, Arizona 85254, (b) 403-134, Abbot Street, Vancouver, BC (V6B 2K4) and at (c) Ajman Media City Free Zone at A-61-01-05-10, Flamingo Villas, Ajman, UAE.  On October 16, 2018, Singhal executed an agreement ("2018 Agreement") "to develop and write code" for Modulus. A true and correct copy of the 2018 Agreement is attached as **Exhibit A** hereto.  Singhal resigned from Modulus on July 6, 2022.

3.      Efficacious is a private limited company formed in November 2012 under the laws of India located at Shop No-202&203, Balaji Plaza LSC-3, Sector-8, Rohini, Delhi, 110085 India.  Signal co-owns and is a co-Director of Efficacious.  According to its website at www.EfficaciousSolutions.com (the "Efficacious Website"), Efficacious "develop[s] turn-key business solutions for e-commerce" along with "providing business

consultancy" in the field of "financial services [and] e-Commerce" – including offerings such as a "Sophisticated Crypto Matching Engine" which provides "live pricing data feeds to any number of users" as well as "Support for Global Digital Assets" including "cryptocurrencies that cater to a wide range of trading preferences[.]"  Upon information and belief, Efficacious now provides and offers to Quintzy and Bloxeo programming services through the direction of Singhal.

4.    Sharma is an individual located at 403-134, Abbot Street, Vancouver, BC (V6B 2K4).  Sharma is a co-owner and co-founder of Bloxeo, and likewise has served as the Sales Director of Quintzy for purposes of marketing, advertising, and selling Quintzy's implicated derivatives exchange trading software (which is a copy-cat of Modulus' software).

5.    Bloxeo is a corporation formed and organized in 2022 under the laws of British Columbia, Canada located at 403-134, Abbot Street, Vancouver, BC (V6B 2K4).  According to its website at www.Bloxeo.io (the "Bloxeo Website"), "Bloxeo is a [FinTech] technology company [which offers] crypto exchanges, alternative trading systems, [and] NFT creators . . . designed for both Big institutions and Micro, Small & Medium enterprises . . . via a single scalable SaaS Platform."  Bloxeo was co-founded and is co-owned by Singhal and Sharma.  Upon information and belief, Bloxeo (through Singhal's former role with Modulus), has repurposed Modulus' trade secret protected source code and related proprietary information relating to the Modulus ModPay Software (defined below) and other Modulus related cryptocurrency exchange software to create, amongst other offerings, Bloxeo's cryptocurrency custody and merchant payment gateway system.

6.    Quintzy is a limited liability company formed in March 2019 under the laws of the United Arab Emirates in the Ajman Media City Free Zone at A-61-01-05-10, Flaming Vallias, Ajman, UAE.  Quintzy is owned by Singhal, who is its sole contact with the UAE (listing an email address: ankit.singhal@hotmail.com).  According to its UAE business license details, Quintzy provides "[c]omputer programming activities, [c]omputer

consultancy and computer facilities management activities[.]".  According to its website at www.Quintzy.com (the "Quintzy Website"), the company maintains over 20+ developers and 150+ customers.  Upon information and belief, Quintzy offers and sells to these 150+ customers a spot and derivatives cryptocurrency exchange platform that are essentially identical to the Modulus Crypto Exchange Software (defined below).

7.     Kang is an individual working at 8611 Roland Street, Suite B, Buena Park, CA 90621.  Kang is a co-owner and co-founder of Bitsmo and Techroo.

8.     Choi is an individual living at 700 South Manhattan Place, Los Angeles, California 90005-4131. Choi is a co-owner and co-founder of Bitsmo and Techroo.

9.     Bitsmo is a limited liability company formed and organized under the laws of Arizona (foreign name Eros Group LLC) and domesticated in California in September 2020 and located at 8611 Roland Street, Suite B, Buena Park, CA 90621.  Bitsmo is owned, managed and controlled by Kang and Choi.

10.    According to its website at www.Bitsmo.io (the "Bitsmo Website"), Bitsmo is a crypto exchange trading platform (allowing for trading of popular crypto currencies like Bitcoin, Ethereum and Litecoin, amongst others).   Previously (from 2018 to until recent), Bitsmo was a Modulus client and licensed Modulus' proprietary and trade secret protected cryptocurrency exchange software.

11.    Upon information and belief, Bitsmo now licenses and uses a cryptocurrency exchange offered by Quintzy.

12.    Techroo is a corporation formed and organized in May 2019 under the laws of California and located at 700 South Manhattan Place, Los Angeles, California 90005-4131.

13.    Upon information and belief, Techroo is owned and/or controlled by Bitsmo (which is in turn controlled by Kang and Choi).

14.     According to its website at www.Tradify.live (the "Tradify Website") is also a cryptocurrency exchange platform featuring centralized spot, futures, options, and P2P trading functionality.

15.     Upon information and belief, Techroo's platform is licensed from Quintzy, which is based on trading functionality developed by Singhal while working for Modulus.

### JURISDICTION AND VENUE

16.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1338 (b), and this Court's supplemental jurisdiction under 28 U.S.C. § 1367.

17.     Personal jurisdiction resides in this Judicial District and/or all Defendants conduct substantial business activities within this Judicial District.   Defendants have engaged in substantial and/or continuous and systematic contacts with Arizona.

18.     All of the Defendants have purposefully directed their actions in Arizona by committing intentional acts, aimed at Modulus which have caused harm to Modulus that Defendants knew would likely to be suffered in Modulus' home state of Arizona.   This included, but is not limited to, the misappropriation and then later use of Modulus trade-secret-protected software relating to spot and derivatives cryptocurrency exchanges and trading platforms (amongst others).   This included Singhal and Efficacious copying of Modulus source code, and then dissemination of portions of that source code (and/or derivatives thereof) to Sharma, Bloxeo, Quintzy, Bitsmo and Tradify for purposes of marketing and offering for sale competitive solutions to that of Modulus.

19.     Defendant Singhal entered into a contract with Modulus in Maricopa County, Arizona which is governed by Arizona law.

20.     All of the foregoing was directed within this Judicial District thereby purposefully availing Defendants to the privileges of conducting business within this Judicial District.   As such, the exercise of jurisdiction is reasonable.

21.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(1) and/or (2) because (i) a substantial part of the events giving rise to the claims occurred within this Judicial District; (ii) certain of the Defendants reside within this Judicial District; and (iii) certain of the Defendants have a principal place of business within this Judicial District.

## GENERAL ALLEGATIONS

22.     Modulus provides proprietary enterprise fintech products and solutions used by over an estimated three million traders and investors worldwide in over 90 countries.

23.     Modulus' value stems from some twenty-five years of experience in the financial technology industry.  Modulus has built valuable, long-term relationships with its clients through its proprietary software and hardware systems which are often customized to meet the exact requirements of clients.

24.     To provide and maintain the foregoing financial technology products and services, Modulus maintains a cadre of software developers, engineers and data scientists which are experts in fintech, deep learning A.I., high performance computing, quant trading, predictive analytics and related disciplines in the financial technology industry.

25.     By 2011, Modulus began providing an Order Matching Engine (OME) to some of the earliest known cryptocurrency exchanges. An (OME) allows a process for matching user orders on an exchange (classifying by purpose, asks, bids, timing, and price) to allow real time trades.

26.     The origins of Modulus' digital currencies software dates back to 2011.  By 2018, Modulus was developing an advanced digital currency exchange (DCE) platform for purposes of allowing customers to trade cryptocurrencies or digital currencies for other assets (including purchase via credit card, etc.).    At this point in time, exchanges for centralized cryptocurrencies were in their infancy (with Kraken, Coinbase, Bittrex, and Binance as the most well-known), with exchanges suffering from high trading fees and data security concerns. See  https://en.wikipedia.org/wiki/Cryptocurrency_exchange (viewed July 22, 2022).

20133-20133-00003\\MCS\\DAG\\5207158.1

27.     By Fall 2018, Modulus had developed the backbone for its digital currency exchange through a new high-performance OME.  Modulus looked to next develop a digital assets exchange and blockchain payment solution to couple with its OME.

### The APA and the 2018 Agreement

28.     After meeting Singhal via the freelance website (UpWork.com), Modulus began discussions with Efficacious (and its owner Singhal) by Fall 2018 regarding Modulus proposed asset purchase of Efficacious' digital assets exchange and blockchain payment solution (the "Efficacious Software").

29.     In October 2018, Singhal traveled from India to meet with Modulus in Scottsdale, Arizona to negotiate the sale of the Efficacious Software and to onboard Singhal and his software developers to work at Modulus fulltime.

30.     On October 16, 2018, Efficacious and Singhal entered into an Asset Purchase Agreement ("APA") with Modulus to convey and transfer all rights and interests in the Efficacious Software, including its (a) "crypto exchange software solution" including its "digital assets (cryptocurrency) trading exchange platform, which includes a fully functional back-end server solution" which would include the "[f]ull source code for the front end and back-end software" (herein the "Modulus Crypto Exchange Software"; and (b) "Blockchain Payment Solution" including "a turnkey API-driven blockchain payment platform that simplifies the implementation of blockchain payments, monitoring, and withdrawals" (herein the "Modulus Blockchain Payment Software").  *See* **Exhibit B**, Schedule A.

31.     Under the APA, Efficacious and Singhal conveyed not only the underlying software for the Modulus Crypto Exchange Software and the Modulus Blockchain Payment Software, but also all intellectual property rights, including copyright, to the underlying source code.  *See id.* at ¶¶ 1.01(g) & 5.09

32.     The same day that the APA was executed, Singhal also signed the 2018 Agreement, which required him to "devote his entire business time, attention, and efforts

to the performance of his duties under this Agreement [where he would] not engage in any other employment while [at Modulus.]"  *See* **Exhibit A**, ¶ 3.

33.     Singhal, under the 2018 Agreement, agreed "to develop and write code" to advance the Modulus Crypto Exchange Software and the Modulus Blockchain Payment Software, in which Singhal would "maintain full back up of all code and all data related to the code." *Id.* at ¶ 2. Upon termination, Singhal was obligated to provide to Modulus "all research and written information concerning" Modulus, including all related documentation relating to the software.  *See id.*

34.     Any software developed and/or advanced under the 2018 Agreement would be "the sole and exclusive property of [Modulus] throughout the world" including all copyright and patent rights to any inventions, processes and products. *Id.* at ¶¶ 6.1 & 6.3. As such, Singhal was obligated to "disclose same to [Modulus] and [Modulus] shall have the full power and authority to register copyrights . . . file and prosecute patents and take any other steps [Modulus] deems appropriate to secure its ownership right in that intellectual property." *Id.* at ¶ 6.2

35.     Moreover, Singhal was further obligated under the 2018 Agreement that he would not "use, communicate, publish, release, disclose or otherwise reveal to any other person ... or retain for any other purposes any Confidential Information" which specifically included any underlying "software programs and other forms or databases" related to Modulus "computer systems and business systems developed by [Modulus] in the operation of its business," and other "confidential information relating to [Modulus including] protectable trade secrets or proprietary information [ regarding its] documents, manuals [or] contacts[.]" *See* **Exhibit A**, ¶¶ 9.1-9.2.

36.     Both the APA and the 2018 Agreement are governed under Arizona Law. *See* **Exhibit A**, ¶ 12 & **Exhibit B**, ¶ 11.06. The APA further allows for recovery of the prevailing parties "reasonable attorney's fees and other costs and expenses" incurred in any legal proceedings between the parties.  *See* **Exhibit B**, ¶ 11.07.

20133-20133-00003\\MCS\\DAG\\5207158.1

37. From October 2018 to December 2019, Singhal remained in Scottsdale to undertake extensive development efforts to pair the Modulus OME with the Modulus Crypto Exchange Software.

38. From January 2019 to December 2020, Singhal traveled on at least three separate occasions from India to Scottsdale for purposes of facilitating advancement of various Modulus software offerings including the Modulus Crypto Exchange Software and the Modulus Blockchain Payment Software.

39. During this same timeframe, Singhal was paid by Modulus and given specific direction and responsibilities to create new fintech software offerings.

40. During the first year under the 2018 Agreement, Singhal's focus was on the development and advancement of the Modulus Crypto Exchange Software.

## Modulus' Efforts to Develop a Derivatives Exchange

41. In or about November 2019, Modulus began exploring the creation of a derivatives exchange (herein defined as the "Modulus Derivatives Exchange") for purposes of providing an exchange for futures contracts, commodities and related arbitrage.

42. Singhal was tasked by Modulus to be the primary programmer for the underlying Modulus Derivatives Exchange, with the understanding that others from Efficacious could also assist in programming (and/or other third-party programmers in which Singhal wanted to engage).

43. Modulus agreed that if Singhal was able to create a viable derivatives exchange, then he would be entitled to a certain percentage of profits from resulting sales while employed by Modulus.  In turn, any and all intellectual property relating to the Modulus Derivatives Exchange, including any copyrights and/or trade secrets relating to the source code, would be solely owned and maintained by Modulus (not Singhal or Efficacious). In fact, the derivatives exchange was to be derived from the existing Modulus spot exchange.

20133-20133-00003\\MCS\\DAG\\5207158.1

44.     Singhal agreed to the proposal to undertake the project on behalf of Modulus under the 2018 Agreement.

45.     From November 2019 until recent, Modulus (through Singhal) as well as various third-party programmers worked on the programming and advancement of the Modulus Derivatives Exchange.

**Modulus' Efforts to Develop its ModPay Software**

46.     Singhal was also tasked (in addition to creating the Modulus Derivatives Exchange), with developing a crypto payment software.

47.     Modulus called the planned software "ModPay" ("ModPay Software") which would be a cryptocurrency custody and merchant payment gateway system, allowing merchants to accept forms of crypto currencies and other digital assets as payments for products and services.

48.     Modulus provided Singhal with specific instructions regarding the planned functionality and capabilities for the ModPay Software.

49.     In January 2022, Singhal advised Modulus that he would no longer be able to complete the ModPay Software but failed to provide any reasoning or basis relating to the underlying programming of the system.

**Efforts to Develop the Modulus P2P Trading Software**

50.     As a third offering, Modulus also discussed with Singhal the need to develop a peer-to-peer trading functionality (the "Modulus P2P Trading Software").

51.     This was based largely on Modulus clients requesting such functionality, as an addition to the Modulus Crypto Exchange Software.

52.     Singhal noted it would take about six-to-eight months to develop the Modulus P2P Trading Software.

53.     Modulus provided Singhal specific instructions regarding the planned functionality and capabilities for the Modulus P2P Trading Software.

54.     However, akin to the ModPay Software, Singhal was never able to deliver a completed and/or functional version of the Modulus P2P Trading Software.

**Singhal's Launch of Quintzy as a Modulus Competitor**

55.     Without informing Modulus, on or about March 24, 2019, Singhal formed and organized Quintzy less than five months after execution of the APA (**Exhibit B**) and the 2018 Agreement (**Exhibit A**).

56.     According to corporate documents filed by Singhal in the United Arab Emirates, Quintzy was formed to provide computer consultancy and programming services in the field of offering crypto exchange software solutions.

57.     In May 2022, Modulus learned via prospective clients that Quintzy (in collaboration with Techroo) was offering crypto exchange software which was touted by Quintzy as a competitive and cheaper solution compared to the Modulus Crypto Exchange Software.

58.     Upon information and belief, from March 2019 to present, Singhal employed the programmers at Efficacious (again without the knowledge of Modulus) for purposes of programming and advancing the same crypto exchange product, that was the purpose and subject of Schedule A of the APA, despite the fact the APA had assigned all title, right, and interest in the underlying source code and related intellectual property to Modulus. *See* **Exhibit A**, ¶¶ 1.01(g) & 5.09.

59.     By June 2022 Modulus began to gather information about Quintzy.  At this point, Modulus learned that Quintzy was advertising both a spot exchange software ("Quintzy Spot Exchange Software") and a derivatives exchange software ("Quintzy Derivatives Exchange Software) (both collectively the "Quintzy Crypto Exchange Solutions").  Such was confirmed based upon marketing information posted on the Quintzy Website.

60.     However, after questioning Singhal about Quintzy immediately thereafter in June 2022, Singhal stated that Quintzy was merely a shell company created for the purpose

of maintaining a bank account in Dubai from which he was to receive commission payments from Modulus, and that Quintzy did not plan to develop or sell software.  Upon further investigation, Singhal's representations regarding Quintzy were further disproven.

61.     Modulus next learned by late June 2022 that Singhal was actively advertising and marketing the Quintzy Crypto Exchange Solutions to prospective clients (many of whom were existing and/or prospective clients of Modulus) via the info@Quintzy.com email address (the "Singhal Quintzy Email Address").

62.     Pricing for the foregoing was positioned to be slightly cheaper than pricing proposed by Modulus for similar platforms.

63.     On June 30, 2022, Modulus was able to demo the Quintzy Crypto Exchange Solutions.   That demo was performed by Mr. Singhal under the alias "AS" with his sales associate under the alias "Alex H."

64.     During Mr. Singhal's demo (the "Quintzy Demo"), which was provided via Zoom, Modulus observed that the Quintzy Crypto Exchange Software was identical in form, function and user interface as compared to the Modulus Crypto Exchange Software.

65.     During select portions of the Quintzy Demo, the Modulus logo was displayed when Mr. Singhal was showing the interface for the crypto software.

66.     Moreover, when Mr. Singhal addressed the Quintzy Derivatives Exchange Software, it included the same exchange for futures contracts, commodities and related arbitrage which Modulus had tasked Singhal to program and develop in November 2019 partially based on requests from Modulus' client, Mike Ting, of c-trade.com.

67.     However, Singhal was advised by Modulus that if he was able to create a viable derivatives exchange, that any intellectual property relating to the Modulus Derivatives Exchange, including any copyrights and/or trade secrets relating to the source code, would be solely owned and maintained by Modulus (not Singhal or Efficacious).

68.     Upon information and belief, the underlying source code for the Quintzy Crypto Exchange Software is based directly upon and/or includes significant portions of the underlying source code for the Modulus Crypto Exchange Software.

69.     Upon information and belief, the underlying source code for the Quintzy Derivatives Exchange was previously developed, programmed and built during Singhal's engagement under the 2018 Agreement.

70.     Upon information and belief, Quintzy has offered for sale and/or sold the Quintzy Spot Exchange Software and/or the Quintzy Derivatives Exchange to various prospective clients and/or actual clients of Modulus.

71.     Upon information and belief, Singhal, through his previous position with Modulus from October 2018 to July 2022, has contacted various Modulus clients and/or prospective clients and offered the Quintzy Spot Exchange Software and/or the Quintzy Derivatives Exchange Software at lower and more advantageous pricing compared to Modulus.

72.     Upon information and belief, Singhal has advised various Modulus clients and/or prospective clients that the Quintzy Spot Exchange Software and/or the Quintzy Derivatives Exchange is the same as the Modulus offerings, and that Modulus was merely a reseller for Quintzy.

**Singhal and Sharma's Launch of Bloxeo as a Modulus Competitor**

73.     Without informing or alerting Modulus, on or about January 27, 2022, Singhal co-founded and co-organized Bloxeo with Sharma in the Providence of British Colombia, Canada.

74.     In doing so, Singhal noted that Bloxeo's address was in Vancouver, Canada but also provided as a secondary address the location of Efficacious in India.

75.     Sharma's LinkedIn profile lists him as CEO and touts how Bloxeo "provides digital assets custody services and merchants [sic] payment solutions for businesses of all size [sic]":



76.     Singhal's profile lists him as Bloxeo's Chief Technology Officer since June 2022:

77.     According to the Bloxeo Website, it offers six fintech products, and has over twenty team members:

20133-20133-00003\\MCS\DAG\5207158.1

    

**Achievements**

## We are a growing business enterprise, with extensive experience in Blockchain & FinTech

**6+**
FinTech products

**100%**
Global reachability

**20+**
Team Member

**99%**
Customer Satisfaction

78.     Upon information and belief, Bloxeo engages the same programmers from Efficacious that developed the Modulus Crypto Exchange Software and the Modulus Blockchain Payment Software.

79.     Multiple components of the Modulus Crypto Exchange Software were programmed under the Go programming language, which is not common practice, which only leads to the likelihood that Bloxeo's systems are based upon what Singhal was programming and developing while at Modulus under the 2018 Agreement.

80.     One of the six fintech products touted on the Bloxeo website provides a cryptocurrency custody and merchant payment gateway system (the "Bloxeo Crypto Payment Software"):

  

20133-20133-00003\\MCS\\DAG\\5207158.1

81.     Based upon review of the foregoing, it appears that Singhal and Sharma have repurposed the ModPay Software – which Singhal had been tasked to develop under the 2018 Agreement with Modulus – to instead and improperly create the Bloxeo Crypto Payment Software.

82.     It is far from coincidence that, at the same time Singhal advised Modulus he would no longer be able to complete the ModPay Software, he instead founded and formed Bloxeo in January 2022.

83.     Singhal, through the 2018 Agreement, was required to "devote his entire business time, attention, and efforts to the performance of his duties under this Agreement . . . and will not engage in any other employment while employed with [Modulus], unless approved by prior written consent of [Modulus]." *See* **Exhibit A**, ¶ 3.

84.     Singhal never alerted Modulus to his creation of Bloxeo, nor did he seek the written consent required under the 2018 Agreement.

85.     Bloxeo was formed some six months prior to Singhal's termination of employment on July 6, 2022.  Likewise, Singhal's self-identified role at Bloxeo as its Chief Technology Officer (as provided via LinkedIn) further predates that resignation.

86.     Upon information and belief, the underlying source code for the Bloxeo Crypto Payment Software is based directly upon and/or includes significant portions of the underlying source code for Modulus' ModPay Software.

87.     Under the 2018 Agreement, Singhal was nonetheless required to assign all software conceived by Singhal (and/or through Efficacious and/or Bloxeo) that were begun prior to his resignation, including any "processes and products, including any idea which were made or conceived by [Singhal] in the performance of the Services [which would] become the sole and exclusive property of [Modulus] throughout the world." *See* **Exhibit A**, ¶ 6.1

88.     Upon information and belief, the underlying source code for the Bloxeo Crypto Payment Software was previously developed, programmed and built during Singhal's engagement under the 2018 Agreement.

89.     Upon information and belief, Bloxeo has offered for sale and/or sold the Bloxeo Crypto Payment Software to various prospective clients and/or actual clients of Modulus.

90.     Upon information and belief, Singhal, through his previous position with Modulus from October 2018 to July 2022, has contacted various Modulus clients and/or prospective clients and offered the Bloxeo Crypto Payment Software.

91.     Upon information and belief, Singhal and/or Sharma have advised various Modulus clients and/or prospective clients that Bloxeo is related and/or is a reseller of Modulus.

**Kang and Choi's Launch of Techroo as a Modulus Competitor**

92.     Kang and Choi founded Bitsmo on October 15, 2018 under the name Eros Group LLC, under the laws of Arizona.

93.     Proximate to formation, Kang and Choi entered into a license agreement on behalf of Bitsmo with Modulus to obtain rights to the Modulus Crypto Exchange Software ("Bitsmo License").

94.     From October 2018 to October 2019, Bitsmo offered at its website www.Bitsmo.io (the "Bitsmo Website") a crypto exchange and trading platform under the Bitsmo License, which is run through the Modulus Crypto Exchange Software.

95.     By late 2019, Bitsmo stopped marketing and advertising its crypto exchange without any explanation to Modulus.

96.     On May 8, 2019, Bitsmo (and/or Kang and Choi) founded Techroo.   Upon information and belief, Techroo was founded proximate to the time that Kang and Choi decided to stop operations of Bitsmo as a crypto exchange and trading platform.

20133-20133-00003\\MCS\\DAG\\5207158.1

97.     In or about September 2020, Kang and Choi domesticated Eros Group LLC under the laws of California.

98.     As of the time of filing suit, both Bitsmo and Techroo remain in good standing with the States of California and Arizona.

99.     Moreover, according to the Bitsmo Website, it touts that Modulus and Techroo remain as "strategic partners" of Bitsmo.

100.    On or about October 2020, Kang and Choi (through Techroo), launched www.Techroo.io (the "Techroo Website") which touted a "crypto exchange" that was a 100% white label cloud-based solution that was not based upon open source.

101.    The Techroo Website was revised and updated by Kang and Choi in or



around January 2022 (around the time that Bloxeo was formed in British Colombia):

102.    The crypto exchange offered at the Techroo Website ("Techroo Crypto Exchange Software") was never licensed to Techroo by Modulus.

103.    Upon information and belief, the underlying source code for the Techroo Crypto Exchange Software is based directly upon and/or includes significant portions of the underlying source code for the Modulus Crypto Exchange Software (potentially from the underlying software licensed by Modulus under the Bitsmo License).

20133-20133-00003\\MCS\DAG\5207158.1

104.    Upon information and belief, the underlying source code for the Techroo Crypto Exchange Software was supplied (and then maintained) by Singhal, Bloxeo, Quintzy and/or Efficacious (and/or by a combination thereof).

105.    Upon information and belief, the underlying source code for the Techroo Crypto Exchange Software was previously developed, programmed and built during Singhal's engagement under the 2018 Agreement.

106.    Kang, Choi and Techroo had specific knowledge that the underlying source code for the Techroo Crypto Exchange Software was programmed and/or developed for Modulus.

107.    Upon information and belief, Techroo has contacted various Modulus clients and/or prospective clients and offered the Techroo Crypto Exchange Software at lower and more advantageous pricing compared to the Modulus Crypto Exchange Software.

108.    Upon information and belief, Techroo has advised various Modulus clients and/or prospective clients that the Techroo Crypto Exchange Software is the same as the Modulus offerings, and that Modulus was merely a reseller.

### Kang and Choi's Launch of Techroo's P2P Trading Software

109.    In June 2022, Modulus was informed by a prospective client that Techroo was offering the Techroo Crypto Exchange Software at the website Tradify.live (the "Tradify Website") (herein the "Tradify Crypto Exchange Software").

110.    Upon investigation, the Tradify Crypto Exchange Software is an exact copy of the Techroo Crypto Exchange Software which recently became available on the Techroo Website.

111.    The Tradify Website also offers spot trading, options and futures (derivatives) trading, and P2P trading, in addition to an NFT marketplace (all collectively the "Tradify Additional Features") under the name Tradify.

20133-20133-00003\\MCS\\DAG\\5207158.1

112.   Modulus was further told that Techroo was marketing and promoting the Tradify Additional Features as compatible add-ons to the Modulus Crypto Exchange Software (and/or through the Techroo Crypto Exchange Software).

113.   Modulus received a presentation (the "Tradify Presentation") prepared by Techroo, which acknowledges the underlying Tradify Crypto Exchange Software Additional Features from Efficacious:



Attached as **Exhibit C** is a true and correct copy of the Tradify Presentation.

114.   The Tradify Presentation next confirmed that the Tradify Crypto Exchange Software would also have optional and additional modules for Tradify Additional Features:



20133-20133-00003\\MCS\\DAG\\5207158.1

115.    Upon information and belief, the Tradify Crypto Exchange Software and Tradify Additional Features is an exact copy of (and/or based substantially on) work completed by Singhal on behalf of Modulus under the 2018 Agreement.

116.    Modulus had discussed the underlying Tradify Additional Features with Singhal and provided specific instructions as to the planned additional functionality.

117.    Singhal noted he would be able to complete the customizations based upon the planned functionality requested by Modulus.

118.    Singhal never delivered the Modulus P2P features.

119.    On information and belief, the underlying source code for the Tradify Crypto Exchange Software and the Tradify Additional Features was supplied (and then maintained) by Singhal, Quintzy and/or Efficacious (and/or by a combination thereof) for Techroo, under the supervision and oversight of Kang and Choi.

120.    Upon information and belief, the underlying source code for the Tradify Crypto Exchange Software and the Tradify Additional Features was previously developed, programmed and built during Singhal's engagement under the 2018 Agreement.  Kang, Choi and Techroo had specific knowledge that the underlying source code for the Tradify Crypto Exchange Software and the Tradify Additional Features was programmed and/or developed for Modulus.

121.    Evidence of such copying of the Modulus Crypto Exchange Software was confirmed in early July 2022 when Modulus had requested from Singhal the most up-to-date iteration of the source code for the Modulus Crypto Exchange Software and found it was littered with various links and references to the Tradify Website and the Tradify Crypto Exchange Software.  One example is shown below:



122.   These multiple links and references to the Tradify Website confirm that the underlying source code was the same for the Modulus Crypto Exchange Software and the later offered Tradify Crypto Exchange Software.

123.   Upon information and belief, Techroo has contacted various Modulus clients and/or prospective clients and offered the Tradify Crypto Exchange Software at lower and more advantageous pricing compared to the Modulus Crypto Exchange Software.

124.   Upon information and belief, Techroo has advised various Modulus clients and/or prospective clients that the Tradify Crypto Exchange Software is the same as the Modulus offerings, and that Modulus was merely a reseller.

### Singhal's Resignation on July 6, 2022

125.   On July 6, 2022, Singhal emailed Modulus his "formal resignation" saying that "the time has come for us to part ways . . . [m]y decision to end employment is irrevocable.   Let's discuss . . . how Modulus can relieve me at the earliest convenience."

126.   In response, Modulus requested later that same day for Singhal to "please create documents about each client customization and please be as detailed as possible about what was planned and how it was planned to be implemented.   Please also provide clear instruction for how to do a new deployment for spot and derivatives and any other information that you think will be needed to continue business.   Please also provide the latest full source code for all products in the next 12 hours if possible."

20133-20133-00003\\MCS\DAG\5207158.1

127.   On July 8, 2022, Modulus, through counsel, sent a letter to Singhal requesting return of all company assets, including all code, reminding him of his obligations under the 2018 Agreement, and asking him to sign a copyright assignment pursuant to his obligations under the 2018 Agreement.

128.   Mr, Singhal did not comply with the requests in the July 8, 2022 letter.

129.   On July 15, 2022, Modulus followed up on the need for documentation including "the Word, word pad, or other notes files that comprise the documentation regarding the features and functions of the derivative exchange." In response, Singhal simply mentioned via email how he "d[id] not have anything left to share."

130.   On July 16, 2022, Modulus followed up with Singhal, requesting the information differently. In response, on July 17, 2022, Singhal remarked "not sure why anyone [sic] cannot create answers to these questions."

131.   On July 11, 2022, a Modulus client informed Modulus that someone located in Delhi, India had logged into their crypto exchange server and moved funds. Later that same day, a second client informed Modulus of the same. This could only mean that Singhal (and/or someone at Efficacious) was accessing Modulus' clients crypto exchange servers and manipulating their digital asset wallets. This forced Modulus to immediately change all crypto exchange servers' passwords.

132.   Modulus further received word on July 18, 2022 that an IP address associated with Singhal was again used to login to another client's crypto exchange server on July 18, 2022.

133.   Modulus confronted Singhal about the foregoing, which resulted in a July 18, 2022 admission that "I will ensure my people won't do this ever again . . . it was just a pure accidental attempt someone did from my office."

134.   Modulus never received from Singhal any of the source code for the Modulus Derivatives Exchange Mobile Apps, the ModPay Software, or the additional features for P2P Trading, NFT Marketplace, Options Trading, or Tokenization.

20133-20133-00003\\MCS\\DAG\\5207158.1

135.   Such was a violation of Paragraph 2 of the 2018 Agreement, which required Singhal to "maintain full back up of all code and all data related to the code."

136.   Moreover, Modulus never received the documentation it repeatedly requested from Singhal, which was contractually required under Paragraph 2 of the 2018 Agreement's provision that "[u]pon termination of employment for any reason, all research and written information concerning [Modulus] which is in [Singhal's] possession shall be delivered to [Modulus.]"

137.   Upon information and belief, Singhal continues to maintain such documentation, as well as full copies of any and all source code for the Modulus Crypto Exchange Software, Modulus Spot and Derivatives Crypto Exchange Software, Modulus Blockchain Payment Software, the ModPay Software, or the features for P2P Trading, NFT Marketplace, Options Trading, and Tokenization.

## COUNT I
## BREACH OF THE ASSET PURCHASE AGREEMENT

(against Singhal and Efficacious only)

138.   Modulus re-alleges and incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

139.   This Count I is an action for breach of contract relating to the October 16, 2018 Asset Purchase Agreement ("APA") between Modulus and both Efficacious and Singhal.

140.   Under the APA, Efficacious and Singhal represented that they "ha[d] developed the software for a digital assets (cryptocurrency) exchange and blockchain payment solution as more fully described in Schedule A (Software)" and that both "desire[d] to sell to [Modulus] . . . the Software[.]"  *See* **Exhibit B**, Recitals B&C. Efficacious and Singhal additionally confirmed that they were "the beneficial and record owner of, and ha[ve] good and marketable title to, all of the [Software]." *Id*. at ¶ 5.01.

141.    Schedule A identifies two general groupings of software to be sold by Efficacious and Singhal to Modulus under the APA:

(a)     "crypto exchange software solution . . . which includes a fully functional back-end server solution, which matches buyers and sellers of digital assets and handles deposits, blockchain confirmations and withdrawals via an included blockchain payment solution, which uses full cryptocurrency nodes, plus a customizable front-end trading application. Full source code for the front-end and back-end software is included, for all components, and for parts of the software, which make for a complete and fully functional customizable cryptocurrency exchange solution" (defined herein as the "Modulus Crypto Exchange Software"); and

(b)     a "Blockchain Payment Solution [which] is a turnkey API-driven blockchain payment platform that simplifies the implementation of blockchain payments, monitoring, and withdrawals. It allows for a quick and easy setup of full cryptocurrency nodes for many of the top blockchains and allows developers to accept deposits, monitor blockchain confirmations, and process withdrawal requests via an easy-to-use programming API that is provided with documentation" (defined herein as the "Modulus Blockchain Payment Software").

*See* **Exhibit B**, Schedule A.

142.    Efficacious and Singhal "acknowledge[]d that upon Closing, they w[ould] have no rights to the Software including no[] right to use or license the Software.  It would be owned solely and exclusively by [Modulus such that Efficacious and Singhal would] not represent to any person that they own or have any right to the Software."  *See* **Exhibit B**, at ¶ 3.02.

143.   Efficacious and Singhal further conveyed all intellectual property rights in the underlying source code to Modulus. *See* **Exhibit B**, ¶¶ 1.01(g) & 5.09

144.   At the closing, held on October 15, 2018 (*id.* at ¶ 303(a), Efficacious and Singhal were required under the ADA to provide the complete (a) source code for both the Modulus Crypto Exchange Software and the Modulus Blockchain Payment Software, as well as execute a Bill of Sale further confirming such transfer.  A true and correct copy of the Bill of Sale is provided as **Exhibit D** hereto.

145.   Within five months from signing the APA, Singhal formed Quintzy to provide computer consultancy and programming services in the field of offering crypto exchange software solutions in competition with Modulus.

146.   Moreover, despite the contractual obligation that Efficacious and Singhal "have no rights to the Software including no[] right to use or license the" Modulus Crypto Exchange Software and the Modulus Blockchain Payment Software, Efficacious and Singhal nonetheless took the underlying source code that they sold to Modulus and simply repurposed it as the Quintzy Spot Exchange Software and the Quintzy Derivatives Exchange Software.

147.   Upon information and belief, Efficacious and Singhal (either directly or through Quintzy) offered the Modulus Crypto Exchange Software (now repurposed as the Quintzy Crypto Exchange Software) to Techroo, as first the Techroo Crypto Exchange Software and then later as the Tradify Crypto Exchange Software.

148.   Both the Techroo Crypto Exchange Software and the Tradify Crypto Exchange Software – as provided to Techroo by Efficacious and Singhal – are based directly upon and/or includes significant portions of the underlying source code for the Modulus Crypto Exchange Software.

149.   The APA constitutes an enforceable and binding agreement between Modulus on one hand, and Efficacious and Singhal on the other.

150.    The foregoing constitute multiple material breaches of the APA by Efficacious and Singhal.

151.    Such material breaches have directly resulted in damages to Modulus in a multitude of ways, including through financial damages in lost sales.

## COUNT II

## BREACH OF THE 2018 AGREEMENT

(against Singhal only)

152.    Modulus re-alleges and incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

153.    This Count II is an action for breach of contract relating to the 2018 Agreement (**Exhibit A**) between Modulus and Singhal.

154.    The 2018 Agreement obligated Singhal "to devote his entire business time, attention, and efforts to the performance of his duties under this Agreement [where he would] not engage in any other employment while [at Modulus.]"  *See* **Exhibit A**, ¶ 3.  It further required him "to develop and write code" to advance the current software purchased under the APA, which would necessarily be "the sole and exclusive property of [Modulus] throughout the world" including all copyright and patent rights to any inventions, processes and products.  *Id.* at ¶¶ 6.1 & 6.3.  He was further required to "maintain full back up of all code and all data related to the code."  *Id.* at ¶ 2. Upon termination, Singhal was obligated to provide to Modulus "all research and written information concerning" Modulus, including all related documentation relating to the software.  *See id.*

155.    The 2018 Agreement required Singhal to, at the request of Modulus, execute additional documents including documents to confirm in the company all right, title and interest throughout the world in and his work product and all copyrights thereon. *See* **Exhibit A**, ¶ 6.4.

156.    Singhal was further obligated under the 2018 Agreement, that he would not "use, communicate, publish, release, disclose or otherwise reveal to any other person ... or

retain for any other purposes any Confidential Information" which specifically included any underlying "software programs and other forms or databases" related to Modulus "computer systems and business systems developed by [Modulus] in the operation of its business," and other "confidential information relating to [Modulus including] protectable trade secrets or proprietary information [ regarding its] documents, manuals [or] contacts[.]" *See* **Exhibit A**, ¶¶ 9.1-9.2.

157.    After entry in the 2018 Agreement, Singhal formed Quintzy for purposes of offering the Quintzy Spot Exchange Software and the Quintzy Derivatives Exchange Software.  The foregoing software in fact was developed by Singhal between 2018 to immediately before Singhal's July 6, 2022 termination of his role with Modulus, thus making it the intellectual property of Modulus.  *See* **Exhibit A**, ¶¶ 9.1-9.2.

158.    Singhal formed Bloxeo immediately before he terminated his role at Modulus on July 6, 2022.  In doing so, Singhal posted on LinkedIn a month before his resignation from Modulus that he was Bloxeo's Chief Technology Officer, which alone breaches the 2018 Agreements requirement that he "devote his entire business time, attention, and efforts to the performance of his duties under this Agreement [where he would] not engage in any other employment while [at Modulus.]" *See* **Exhibit A**, ¶ 3.

159.    Bloxeo now offers for sale and sells its Bloxeo Crypto Payment Software, which is based directly upon and/or includes significant portions of the underlying source code for the ModPay Software that Modulus tasked Singhal to program under the 2018 Agreement.

160.    The 2018 Agreement obligated Singhal to assign all software regarding the ModPay Software including any "processes and products, including any idea which were made or conceived by [Singhal] in the performance of the Services [which would] become the sole and exclusive property of [Modulus] throughout the world." *See* **Exhibit A**, ¶ 6.1.

161.    Singhal (either directly or through Quintzy) has offered and sold the Modulus Crypto Exchange Software (now repurposed as the Quintzy Crypto Exchange Software) to

Techroo, as, first, the Techroo Crypto Exchange Software and then, later, as the Tradify Crypto Exchange Software.

162.   Both the Techroo Crypto Exchange Software and the Tradify Crypto Exchange Software – as provided to Techroo by Efficacious and Singhal – are based directly upon and/or includes significant portions of the underlying source code for the Modulus Crypto Exchange Software.

163.   Singhal's offers for sale and/or sale of the Techroo Crypto Exchange Software and the Tradify Crypto Exchange Software to Techroo clearly breached Sections 9.1-9.2 of the 2018 Agreement.

164.   Additionally, Singhal (either directly or through Quintzy) has offered and sold to Techroo the Tradify Additional Features for P2P Trading, NFT Marketplace, Options Trading, and Tokenization which is an exact copy (and/or based substantially) on work completed by Singhal on behalf of Modulus under the 2018 Agreement for the Modulus Software.

165.   The underlying source code for the Tradify P2P Trading Software was previously developed, programmed and built during Singhal's engagement under the 2018 Agreement.

166.   The 2018 Agreement obligated Singhal to assign all software regarding the Modulus P2P Trading Software including any "processes and products, including any idea which were made or conceived by [Singhal] in the performance of the Services [which would] become the sole and exclusive property of [Modulus] throughout the world." *See* **Exhibit A**, ¶ 6.1.

167.   Singhal's offers for sale and/or sale of the Tradify P2P Trading Software to Techroo breached Sections 9.1-9.2 of the 2018 Agreement.

168.   Upon his resignation, Singhal was obligated to provide Modulus under Paragraph 2 of the 2018 Agreement "all research and written information concerning" Modulus, including all related documentation relating to the" Modulus Crypto Exchange

20133-20133-00003\\MCS\\DAG\\5207158.1

Software, ModPay Software, and Modulus Additional Features including but not limited to P2P Trading, NFT Marketplace, Options Trading, and Tokenization amongst other software.

169.   Singhal failed to provide all requested documentation and source code relating to the ModPay Software and Modulus Additional Features.

170.   Singhal failed to execute a proffered assignment confirming Modulus' ownership of the copyrights in his work product.

171.   The 2018 Agreement constitutes an enforceable and binding agreement between Modulus on one hand, and Singhal on the other.

172.   The foregoing constitute multiple material breaches of the 2018 Agreement by Singhal.

173.   Such material breaches have directly resulted in damages to Modulus in a multitude of ways, including through financial damages in lost sales.

## COUNT III

## MISAPPROPRIATION OF TRADE SECRETS – 18 U.S.C. § 1836(b)

(against all Defendants)

174.   Modulus re-alleges and incorporates by reference all paragraphs to this Complaint as if fully set forth herein.

175.   This Count III is an action for violation of 18 U.S.C. § 1836(b) against all Defendants' efforts to use, access, review, maintain and/or employ the Modulus Spot and Derivatives Crypto Exchange Software, Modulus Blockchain Payment Software, the ModPay Software, the Modulus Additional Features including but not limited to the underlying source code, computer programming, algorithms, workflows, system architecture, and related documentation (all collectively the "Modulus Trade Secrets").

176.   This is an action against Defendants' acquisition of the aforementioned trade secrets when Defendants knew or had reason to know that those trade secrets were acquired

by improper means and/or disclosed or used those trade secrets without express or implied consent by Modulus.

177. Modulus has invested considerable time, money, and skill – as well as hundreds of thousands of programming hours over the course of more than two decades – in the development of its unique, proprietary and industry leading software as found within the Modulus Trade Secrets.

178. The Modulus Trade Secrets constitute trade secrets within the meaning of 18 U.S.C. § 1839(3) as they are types of business, technical information, engineering information, patterns, formulas, techniques, procedures, programs, and codes that Modulus has taken reasonable measures to keep secret (including through agreements). Moreover, Modulus is the owner of such trade secret information, including under the APA and the 2018 Agreement.

179. The Modulus Trade Secrets are highly valuable because they are industry-leading in the fintech space, relating to crypto exchanges.

180. Defendants have engaged in a series of clandestine and illicit activities designed to ascertain and uncover the underlying trade secrets of Modulus.

181. Upon information and belief, Defendants, either directly or through the actions of third parties, willfully, knowingly and without authorization, accessed or caused to be accessed the Modulus Trade Secrets.

182. Defendants' actions were without Modulus' knowledge, authorization or consent.

183. As provided above in greater detail, Defendants, either directly or through the actions of third parties, willfully, knowingly and without authorization, accessed the Modulus Trade Secrets to acquire the underlying source code.

184. Modulus' trade secret information derives independent economic value from not being generally known to, and not being readily ascertainable by proper means by other

persons who may be able to obtain economic value from its disclosure or use within the meaning of 18 U.S.C. § 1839(3)(B).

185.   Modulus' trade secret information has been the subject of efforts that are reasonable under the circumstances to maintain the secrecy of that information.

186.   Defendants improperly and without any form of authorization misappropriated Modulus' valuable and unique trade secret information for their own use and benefit to Modulus' detriment.

187.   Modulus has suffered a compensable injury by reason of Defendants' misappropriation of trade secrets as outlined above, and will continue to suffer an irreparable injury unless Defendants' conduct is preliminarily and then permanently enjoined under 18 U.S.C. §1836(b)(3)(A).

188.   Such preliminary (and then later) permanent injunction should be sufficient in scope and effect so as to prevent any actual or threatened misappropriation, as identified above, on such terms as this Court deems reasonable to prevent Defendants from entering into relationships that may risk such misappropriation and should include conditions placed on any future employment so not to risk threatened misappropriation.

189.   Upon information and belief, the conduct of the Defendants as outlined in this Count III was engaged in with willful and malicious disregard for Modulus' rights, so as to justify attorneys' fees under 18 U.S.C. § 1836(b)(3)(D).

190.   Upon information and belief, the conduct of the Defendants as outlined in this Count III warrants Defendants to pay damages to Modulus for (i) actual loss caused by the misappropriation of the trade secrets and (ii) damages for any unjust enrichment caused by misappropriation of the trade secrets that is not addressed in computing damages for actual loss.

191.   Upon information and belief, Defendants conduct in the aforementioned misappropriation was so willful and malicious so as to justify and warrant exemplary

damages under 18 U.S.C. § 1836(b)(3)(C) in the amount twice that of the amount of damages addressed in this paragraph.

## COUNT IV

## CIVIL CONSPIRACY TO COMMIT TRADE SECRET THEFT

(against Singhal, Sharma, Kang and Choi)

192.    Modulus re-alleges and incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

193.    This Count III is a claim for civil conspiracy to commit trade secret theft directed against Singhal, Sharma, Kang and Choi (the "Conspirators") in their individual capacities.

194.    Within the last several months, unbeknownst to Modulus, the Conspirators engaged in a carefully organized clandestine scheme to use (a) the prior source code of Efficacious at the time of the APA, (b) the advancements to the underlying Modulus Trade Secrets developed from October 2018 to July 2022 by Sharma and/or his programmers at Efficacious developed under the 2018 Agreement (and the direction of Modulus), and/or (c) copies of the Modulus Crypto Exchange licensed to Kang and Choi by Modulus under the Bitsmo License.

195.    Between October 2018 to July 2022, Modulus had greatly improved and advanced the Modulus Trade Secrets from what was purchased under the APA.

196.    During this forty-five month period, Singhal maintained the source code for the Modulus Trade Secrets, including for various new planned projects like ModPay, the Modulus Exchange Software and Modulus Additional Features.

197.    Such software was then circulated through Sharma for purposes of sale to various potential clients, most of whom were prospective or actual customers of Modulus. In addition, Singhal and Sharma provided this source code to Kang and Choi for purposes of employing it through Techroo. The result was that all of the Conspirators benefited

from a carefully planned and implemented conspiracy – all performed to obtain proprietary information regarding the Modulus Trade Secrets.

198.    All of the foregoing occurred without the knowledge, authorization or consent of Modulus.

199.    The Conspirators all engaged together in the aforementioned overt acts – all to obtain information regarding and related to the inner workings of the Modulus Trade Secrets.   Moreover, they benefited from obtaining such information which was then directly used and employed to create the copy-cat software, including but not limited to the Techroo Crypto Exchange Software, the Tradify Crypto Exchange Software and/or the Modulus Additional Features.

200.    As a result of the foregoing, Modulus has been damaged by these acts (and continuing acts) pursuant to the foregoing conspiracy.

201.    The Conspirators are jointly and severally liable to pay damages to Modulus for (i) actual loss caused by the misappropriation of the trade secrets and (ii) damages for any unjust enrichment caused by misappropriation of the trade secrets that is not addressed in computing damages for actual loss.

## COUNT V

## MISAPPROPRIATION OF TRADE SECRETS – A.R.S. §§44-401 TO 44-407

(against all Defendants)

202.    Modulus re-alleges and incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

203.    This Count IV is an action for violation of the Arizona Uniform Trade Secrets Act (codified at A.R.S. §§44-401 to 44-407) against all Defendants' efforts to misappropriate and use, by improper means, the Modulus Trade Secrets without the express or implied consent of Modulus, when at the time of such use Defendants had reason to know that the Modulus Trade Secrets were derived from or through Singhal and/or Efficacious.

204.   The Modulus Trade Secrets fall within the definition of § 44-401(4), as they constitute computer programs and associated information that (a) derives independent economic value from not being generally known to, and not being readily ascertainable by proper means by other persons, and (b) was the subject of Modulus' reasonable efforts under the circumstances to maintain its secrecy.

205.   Modulus limited access to the Modulus Trade Secrets through various confidentiality agreements, including under the APA as well as the 2018 Agreement. Further, Modulus required limited password-protected access to anyone programming the underlying Modulus Spot and Derivatives Crypto Exchange Software, Modulus Blockchain Payment Software, the ModPay Software, the Modulus Additional Features.

206.   Defendants misappropriated the Modulus Trade Secrets in a variety of ways since the execution of both the APA and the October 2018 Agreement.  Despite transfer of all rights in the underlying software under the APA, Singhal and Efficacious still maintained and possessed copies of the Modulus Crypto Exchange Software and the Modulus Blockchain Payment Software.  Moreover, when Singhal was tasked under the October 2018 Agreement to create the Modulus Spot and Derivatives Crypto Exchange Software, the ModPay Software, the Modulus Additional Features, Singhal likewise maintained all software to those planned platforms and/or maintained them through Efficacious.  Through this mechanism, the Modulus Trade Secrets were improperly acquired through Singhal and maintained by Singhal and/or Efficacious, all knowing that the underlying source code was acquired improperly as he had no right to the software under the APA and the October 2018 Agreement (and such disclosure and/or use of the software was without the express or implied consent by Modulus).

207.   Singhal and/or Efficacious provided the software to Quintzy for purposes of using the underlying source code and related documentation to create the Quintzy Crypto Exchange Software, which is based upon at least significant portions of the underlying source code for the Modulus Crypto Exchange Software.

208. Singhal and/or Efficacious further provided to Quintzy source code and related documentation for the Quintzy Spot Exchange Software and/or the Quintzy Derivatives Exchange, which had been previously developed, programmed and built during Singhal's engagement under the 2018 Agreement.

209. Quintzy and Singhal knew, or had reason to know, that the underlying source code for the Quintzy Spot Exchange Software and/or the Quintzy Derivatives Exchange were acquired by improper means and had been used without the express or implied consent of Modulus.

210. Singhal and/or Efficacious additionally provided the software to Bloxeo and Sharma for purposes of using the underlying source code and related documentation to create the Bloxeo Crypto Payment Software as a cryptocurrency custody and merchant payment gateway system.

211. Singhal and Sharma, on behalf of Bloxeo, acquired the underlying trade secrets of Modulus regarding the ModPay Software – which Singhal had been tasked to develop under the 2018 Agreement – to create and offer the Bloxeo Crypto Payment Software.

212. Bloxeo and Sharma knew, or had reason to know, that the underlying source code for the Bloxeo Crypto Payment Software was acquired by improper means, and had been used without the express or implied consent of Modulus.

213. Singhal and/or Efficacious further provided to Techroo, Kang and Choi the Techroo Crypto Exchange Software, the Tradify Crypto Exchange Software and/or the Tradify Additional Features –which had been previously developed, programmed and built during Singhal's engagement under the 2018 Agreement, including being based upon the Modulus Crypto Exchange Software.

214. Techroo, Kang and Choi knew, or had reason to know, that the underlying source code for the foregoing was based upon source code created for Modulus.

215.   Defendants, including through the direct and improper actions of Singhal and/or Efficacious, willfully, knowingly and without authorization accessed or caused to be accessed the underlying source code and documentation included in the Modulus Trade Secrets.

216.   Modulus has suffered damages due to the aforementioned appropriation, including all amounts recoverable under § 44-403.   This includes recovery of both the actual loss caused by Defendants' misappropriation and unjust enrichment caused by misappropriation that is not taken into account in computing actual loss.

217.   As the foregoing acts by Defendants are willful and malicious, exemplary damages are further warranted under § 44-403.

## COUNT VI
## COMMON LAW BREACH OF DUTY OF LOYALTY
### (against Singhal only)

218.   Modulus re-alleges and incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

219.   This Count VI is an action for breach of the duty of loyalty under the common law of the State of Arizona directed against Singhal only.

220.   From October 2018 to July 2022, Singhal served as an agent for Modulus, regarding and relating to the maintenance, advancement, and development of the Modulus Crypto Exchange Software, amongst other source code, documentation and related software that was the subject of the APA.

221.   Singhal was given, and he accepted, certain duties and related obligations to act in the best interests of Modulus regarding the advancement of the Modulus Crypto Exchange Software as well as the creation and programming of new related software offerings including the Modulus Spot and Derivatives Crypto Exchange Software, the ModPay Software, the Modulus Additional Features.

20133-20133-00003\\MCS\\DAG\\5207158.1

222.    Singhal breached his agency obligations by not acting in the best interest of Modulus and by engaging in acts designed to injure his agency relationship with Modulus.

223.    Such breaches included the clandestine and improper formation of Quintzy as a Modulus competitor and then using, employing, accessing and disseminating Modulus source code and documentation for purposes of the creation, launch, offering and sales of the Quintzy Spot Exchange Software and/or the Quintzy Derivatives Exchange.

224.    Further breaches included the clandestine and improper formation of Bloxeo as a Modulus competitor and repurposing the underlying source code and related documentation for ModPay to create the Bloxeo Crypto Payment Software.

225.    Finally, such breaches including further efforts by Singhal to use, employ, access and disseminate the Modulus source code and documentation relating to the Modulus Additional Features, which Singhal was developing for Modulus, to instead offer to Techroo for purposes of creating the Tradify Additional Features.

226.    Upon his resignation, Singhal was furthermore obligated to provide certain research and written information regarding the underlying documentation for the Modulus Crypto Exchange Software, ModPay Software, and Modulus Additional Features amongst other software.

227.    Singhal failed to provide all requested documentation and source code relating to the ModPay Software and Modulus Additional Features.  This too included a significant and independent breach of his duty of loyalty to Modulus.

228.    All of the foregoing was designed and orchestrated by Singhal to unfairly compete with Modulus, as well as to injure his prior agency relationship with Modulus.

229.    As a result of Singhal's multiple and significant breaches of his duty of loyalty, Modulus has sustained significant damages in an amount to be ascertained at trial.

20133-20133-00003\\MCS\\DAG\\5207158.1

# COUNT VII

## COMMON LAW BREACH OF FIDUCIARY DUTY

(against Singhal only)

230.    Modulus re-alleges and incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

231.    This Count VII is an action for breach of a fiduciary duty under the common law of the State of Arizona directed against Singhal only

232.    Separate and in addition to his duty of loyalty, Singhal further owed a fiduciary duty towards Modulus to act in the best interests of the company.  As a fiduciary to Modulus, Singhal was tasked to act in the best interests of Modulus, and to engage in an appropriate and prudent matter to safeguard the various source code, documentation and related software associated with the Modulus Spot and Derivatives Crypto Exchange Software, Modulus Blockchain Payment Software, the ModPay Software and the Modulus Additional Features.

233.    Singhal breached his fiduciary duty to Modulus, including by the clandestine and improper formation of Quintzy as a Modulus competitor and then using, employing, accessing and disseminating Modulus source code and documentation for purposes of the creation, launch, offering and sales of the Quintzy Spot Exchange Software and/or the Quintzy Derivatives Exchange.

234.    Further breaches included the clandestine and improper formation of Bloxeo as a Modulus competitor and repurposing the underlying source code and related documentation for ModPay to create the Bloxeo Crypto Payment Software.

235.    Finally, such breaches include further efforts by Singhal to use, employ, access and disseminate the Modulus source code and documentation relating to the Modulus Additional Features, which Singhal was developing for Modulus, to instead offer to Techroo for purposes of creating the Tradify Additional Features.

236.   As a result of Singhal's multiple and significant breaches of his fiduciary duty, Modulus has sustained significant damages in an amount to be ascertained at trial.

## COUNT VIII

## COMMON LAW TRESPASS TO CHATTELS

(against all Defendants)

237.   Modulus re-alleges and incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

238.   This Count VIII is an action for trespass to chattels under the common law of the State of Arizona directed against all Defendants.

239.   Defendants knowingly, willfully and unlawfully committed a trespass to chattels of Modulus in that Defendants did, without authorization or permission, trespass upon the Modulus property, namely its various source code and related documentation for the Modulus Spot and Derivatives Crypto Exchange Software, Modulus Blockchain Payment Software, the ModPay Software, the Modulus Additional Features all in order for Defendants to employ this sensitive information developed and wholly owned by Modulus.

240.   Defendants committed the aforementioned conduct with the intent and purpose of depriving Modulus of the competitive advantages, benefits and value contained within the information taken, for the purposes of gaining an unfair competitive advantage in the market.

241.   Modulus has suffered irreparable injury, as more particularly outlined above, and will continue to suffer irreparable injury without preliminary and permanent injunctive relief.

242.   Modulus has sustained monetary losses as a direct and proximate result of the aforementioned conduct of Defendants.

20133-20133-00003\\MCS\\DAG\\5207158.1

## COUNT IX

## INTENTIONAL INTERFERENCE WITH A BUSINESS EXPECTANCY

(against Singhal and Quintzy only)

243.   Modulus re-alleges and incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

244.   This Count IX is an action for intentional interference with a business expectancy under the common law of the State of Arizona directed against all Defendants.

245.   Modulus has had several valid business expectancies regarding the offering of various software, including relating to spot and derivatives exchanges.

246.   Singhal and Quintzy knew of these relationships that Modulus had or the related expectancy regarding these potential sales.

247.   Singhal has advised various Modulus clients and/or prospective clients that the Quintzy Spot Exchange Software and/or the Quintzy Derivatives Exchange is the same as the Modulus offerings, and that Modulus was merely a reseller for Quintzy.

248.   Singhal and/or Quintzy intentionally interfered with these prospective deals that Modulus was negotiating relating to spot and derivatives exchanges.

249.   The result is that the prospective deals for the software were disturbed through the improper action on the part of Singhal and/or Quintzy.

## COUNT X

## UNFAIR COMPETITION AND FALSE DESIGNATION OF ORIGIN

## 15 U.S.C. § 1125(a)

(against all Defendants)

250.   Modulus re-alleges and incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

251.   This Count X is an action for unfair competition and false designation of origin under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), directed against all Defendants.

20133-20133-00003\\MCS\\DAG\\5207158.1

252.    Modulus is the service-mark licensee for the mark MODULUS in connection with software design and development, software development tools, computer software for statistical analysis, database engines, finance, stock trading, stock market data and artificial intelligence, as well as business monitoring and consulting services (the "MODULUS Mark").

253.    The MODULUS Mark is registered with the United States Patent and Trademark Office ("USPTO") under U.S. Registration Nos. 4,755,560 and 6,624,640 (the "MODULUS Mark").

254.    Modulus is authorized to enforce its rights in the MODULUS Mark in federal court.

255.    During select portions of the Quintzy Demo, the Modulus logo was displayed when Mr. Singhal was showing the interface for the crypto software.

256.    Upon information and belief, Singhal has advised various Modulus clients and/or prospective clients that the Quintzy Spot Exchange Software and/or the Quintzy Derivatives Exchange is the same as the Modulus offerings, and that Modulus was merely a reseller for Quintzy.

257.    Moreover, according to the Bitsmo Website, it touts that Modulus and Techroo remain as "strategic partners" of Bitsmo.

258.    Upon information and belief, Techroo has advised various Modulus clients and/or prospective clients that the Techroo Crypto Exchange Software is the same as the Modulus offerings, and that Modulus was merely a reseller.

259.    Modulus has been told that Techroo was marketing and promoting the Tradify Additional Features as compatible add-ons to the Modulus Crypto Exchange Software (and/or through the Techroo Crypto Exchange Software).

260.    Upon information and belief, Techroo has advised various Modulus clients and/or prospective clients that the Tradify Crypto Exchange Software is the same as the Modulus offerings, and that Modulus was merely a reseller.

261. Defendants have and continue to use the MODULUS Mark in commerce.

262. Defendants' unauthorized use in commerce of the MODULUS Mark is likely to deceive consumers as to the origin, source, sponsorship, or affiliation of Defendants' goods, and is likely to cause consumers to believe, contrary to fact, that Defendants' offerings are sold, authorized, endorsed, or sponsored by Modulus, or that Defendant is in some way affiliated with or sponsored by Modulus.

263. Defendant's conduct constitutes unfair competition and false designation of origin in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

264. Defendants committed the foregoing acts of unfair competition and false designation of origin with full knowledge of Modulus' prior rights in the MODULUS Mark.

265. Defendants committed the foregoing acts of infringement with willful intent to cause confusion and trade on Modulus' goodwill.

266. Defendants' conduct is causing immediate and irreparable harm and injury to Modulus, and to its goodwill and reputation, and will continue to both damage Modulus and confuse the public unless enjoined by this court. Modulus has no adequate remedy at law.

267. Modulus is entitled to, among other relief, injunctive relief and an award of actual damages, Defendants' profits, enhanced damages, reasonable attorney fees, and costs of the action under Sections 34 and 35 of the Lanham Act, 15 U.S.C. §§ 1116, 1117, together with prejudgment and post-judgment interest.

## COUNT XI
## FALSE ADVERTISING – 15 U.S.C. § 1125(a)

(against all Defendants)

268. Modulus re-alleges and incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

269.    This Count XI is an action for false advertising under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), directed against all Defendants.

270.    Defendants have made false and/or misleading representations of fact in commercial advertising or promotion concerning the nature, characteristics, and qualities of Modulus' services and commercial activities.

271.    Defendants' misrepresentations were made in interstate commerce.

272.    Defendants' misrepresentations deceived or had the capacity to deceive a substantial segment of Modulus's customers and potential customers.

273.    Defendants' activities alleged herein were willful and were intended to and likely to influence a consumer's purchasing decision.

274.    As a direct and proximate result of Defendants' unlawful activities, Modulus has been damaged in an amount to be proven at trial.

275.    Defendants' activities are causing, and unless restrained will continue to cause, damage, and immediate irreparable harm to Modulus and to its valuable reputation and goodwill with the consuming public for which Modulus has no adequate remedy at law.

276.    Modulus is entitled to injunctive relief, an award of actual damages, Defendants' profits, enhanced damages and profits, reasonable attorney fees, and costs of suit under Sections 34 & 35 of the Lanham Act, 15 U.S.C. §§ 1116 & 1117, together with pre- and post-judgment interest.

## COUNT XII
## COMMON LAW UNFAIR COMPETITION
## AND TRADEMARK INFRINGEMENT

(against all Defendants)

277.    Modulus re-alleges and incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

278.    This Count XII is an action for unfair competition and trademark infringement under the common law of the State of Arizona directed against all Defendants.

279.    Defendants' conduct violates Modulus's common law trademark rights and constitutes unfair competition and trademark infringement.

280.    The relevant consuming public recognizes Modulus as the source of goods containing the MODULUS Mark.

281.    Defendants' actions are likely to cause confusion, or mistake, or to deceive as to Defendants' affiliation, connection, or association with Modulus, or as to the origin, sponsorship, or approval of its commercial activities.

282.    Defendants committed these acts maliciously and in conscious disregard of Modulus' rights.

### PRAYER FOR RELIEF

WHEREFORE, Modulus. requests entry of judgment in its favor and against Defendants as follows:

A.    For declaratory relief finding that Defendants' activities complained of herein are unlawful under federal and state law;

B.    For an award of actual damages to compensate Modulus for its losses, damage to its business reputation, and/or lost sales and profits caused by Defendants' unlawful conduct;

C.    For an award in an amount equal to Defendants' profits attributable to their unlawful conduct;

D.    For an award of appropriate and available damages as a consequence of Defendants' willful infringement in violation of the Lanham Act;

E.    For an award of punitive damages in an amount appropriate to punish Defendants for their intentional and/or reckless disregard of Modulus's rights, and to deter Defendants and others from engaging in such misconduct in the future;

F.      For an award of attorney fees and costs pursuant to the terms of the applicable contract(s), A.R.S.§§ 12-341 & 12-341.01, as otherwise provided by law;

G.      For an award of pre- and post-judgment interest on any ultimate award to the maximum amount permitted by law;

H.      For preliminary and permanent injunctive relief ordering Defendants and their members, representatives, officers, directors, agents, servants, employees, and any and all persons or entities in active concert with them, to:

a.      Execute appropriate copyright assignments of work product created by Singhal and his agents to Modulus;

b.      Immediately cease and desist from engaging in any further trade secret violations, including, without limitation, disclosure or dissemination of any Modulus owned source code;

c.      Immediately purge all copies of Modulus source code;

d.      Immediately cease and desist from engaging in any further acts of trademark infringement, false designation of origin, and unfair competition with regard to the Modulus Mark and otherwise causing confusion as to the origin of Defendants' products. andImmediately cease and desist from using or authorizing any third party to use any false or misleading representation of fact concerning Modulus' services or commercial activities; and

I.      For such other and further relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff MODULUS GLOBAL INC. respectfully demands a trial by jury in this action.

DATED: August 29, 2022                    JABURG & WILK, P.C.

By:/s/Maria Crimi Speth
Maria Crimi Speth, Esq.
Aaron K. Haar, Esq.

Attorneys for Plaintiff
MODULUS GLOBAL INC.